IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| LARRY BANGERTER; ALEX AND ELENA BORROMEO; CAMP FIRE SNOHOMISH COUNTY; CAROL BRITTEN; JAMES WAAK, individually and as lot owners and derivatively on behalf of HAT ISLAND COMMUNITY ASSOCIATION, a Washington non-profit corporation, | No. 79264-4-I |
| Plaintiffs, | DIVISION ONE |
| MATT SUROWIECKI, SR., | |
| Appellant, | PUBLISHED OPINION |
| v. | |
| HAT ISLAND COMMUNITY ASSOCIATION, a Washington non-profit corporation; and CHUCK MOTSON, an individual, | |
| Respondents, | |
| KAREN CONNER, an individual; ALAN DASHEN, an individual; SUSAN DAHL, an individual; and JOHN DOES 1-10, individuals, | |
| Defendants. | |

ANDRUS, A.C.J. — Matt Surowiecki, Sr.—the owner of several lots on Hat Island, a private island located off Everett, Washington—appeals the dismissal of

his claims against Hat Island Community Association (HICA), the nonprofit entity that maintains the roads and other amenities on Hat Island.

As a member of HICA, Surowiecki pays an annual operating assessment levied by the association. Historically, HICA has levied assessments based on a uniform, per lot structure. Surowiecki brought this declaratory judgment action, seeking a judicial determination that HICA's uniform, per lot assessment structure violates HICA's governing documents, which mandate that annual operating assessments be "equitable."[1] He also brought derivative claims on behalf of HICA against the board of trustees and its manager, Chuck Motson, alleging they breached fiduciary duties owed to HICA by mismanaging the association's financial affairs. Finally, Surowiecki sought to invalidate a settlement agreement he entered into with HICA in 2012, alleging he had been fraudulently induced to enter into that agreement.

Surowiecki argues the trial court erred in dismissing his challenge to HICA's assessment structure, erred in concluding he lacks standing to bring derivative claims, erred in dismissing his breach of fiduciary duty claim against HICA, and erred in awarding attorney fees to HICA.[2]

---

[1] Six other plaintiffs joined Surowiecki's suit. Surowiecki, however, is the only appellant. In addition, the suit named members of HICA's board of trustees and its manager, Chuck Motson, as individual defendants. Surowiecki later voluntarily dismissed, without prejudice, the individual trustees. And although he listed in his notice of appeal the trial court's June 14, 2018 order granting Motson's motion for partial summary judgment, which dismissed Motson as a party, Surowiecki abandoned his appeal relating to Motson by not assigning error to the June 14, 2018 order or otherwise addressing the order in his briefing. As a result, for simplicity, this opinion refers to Surowiecki as the sole plaintiff/appellant and to HICA as the sole defendant/respondent.

[2] The trial court also awarded attorney fees to Motson. We affirm the attorney fee award to Motson as Surowiecki abandoned his appeal relating to Motson. See supra note 1. Furthermore, Surowiecki addresses only the court's award to HICA in his briefing.

Because the trial court applied an incorrect legal standard when ruling on Surowiecki's assessment claim, we reverse the order granting summary judgment on that claim only. We vacate in part the award of attorney fees to HICA.[3] We otherwise affirm the trial court.

## FACTS

### A. Background of Dispute

#### 1. HICA's Governance

HICA is a nonprofit homeowner association that owns and maintains the common areas on Hat Island—including platted roads, a golf course, a marina, a ferry, and a water treatment and distribution facility. Lots within HICA are subject to Restrictive Covenants Running with Land and Easements (Covenants), originally recorded in 1962. HICA operates pursuant to its articles of incorporation and bylaws as well as the Washington Nonprofit Corporation Act[4] (WNCA) and the Homeowners' Association Act.[5]

Under HICA's articles of incorporation, the association is required to maintain the island's infrastructure, including roads, recreational facilities, transportation, and water system "in a fiscally responsible manner." Anyone owning a lot subject to HICA's Covenants is automatically a member of the association and responsible for "dues or assessments for the construction or reconstruction, or capital additions to or capital improvements of any of the facilities

---

[3] We affirm the attorney fee award relating to the dismissal of Surowiecki's fraudulent inducement claims under the 2012 settlement agreement as Surowiecki has not appealed the dismissal of that claim.

[4] Ch. 24.03 RCW.

[5] Ch. 64.38 RCW.

- 3 -

to be administered by [HICA], or monthly or annual charges for the upkeep thereof." Each member, regardless of the number of lots owned, has one vote.

HICA, which has the powers granted to nonprofit corporations and homeowner associations under Washington law, is managed by a board of trustees. HICA's bylaws provide that it has "the power to levy and collect assessments against its members," for the purposes set out in the articles of incorporation. The board of trustees is responsible for managing and controlling the affairs of the association, including charging or assessing parcels of land and their owners.

HICA's board manages the association's revenue and expenses. Under the Covenants, the company that originally developed the island agreed to provide roads for ingress and egress, a golf course, water supply, electric service, and ferry transportation to the island. When these facilities were turned over to the Hat Island Country Club, HICA's predecessor, the Covenants granted the club

> the power to charge and assess its members on an equitable basis for the operation and maintenance of said facilities . . . and to charge and assess its members on an equitable basis for such additional recreational and other facilities as shall be duly authorized by its membership for the mutual benefit of all its members.

Between 2002 and 2010, article VIII of HICA's bylaws, entitled "Assessments and Charges," provided in pertinent part:

> SECTION 1. The Board of Trustees shall annually establish an assessment against each and every lot on a <u>uniform</u> basis. The amount of such assessment levied shall in no event, except as hereinafter provided, exceed in any one month the sum of [t]wenty one dollars and twenty five cents ($21.25) per lot. Assessments will be established and levied upon all properties following the affirmative vote of a simple majority (50% plus 1) of all members in good standing. Assessments shall be collected and expended pursuant

to the Articles of Incorporation and these By-Laws.  Members shall be liable for the payment of any and all assessments applicable to their respective lots.

. . . .

Special assessments may be levied upon the affirmative vote of a majority of members in good standing voting at a meeting of members of the corporation. Special assessments do not need to be uniform, and may apply only to those lots specially benefited; provided, that in such cases the special assessments must be authorized by a vote of a majority of the members in good standing who own lots which will be subject to the special assessments.

In 2010, HICA's members amended section 1 of article VIII to remove the uniformity requirement.  Section 1, in pertinent part, now provides:

SECTION 1.  The Board of Trustees shall annually determine the proposed amount of the annual operating assessment against each and every lot for the subsequent year.  Such proposed annual operating assessment, if changed from the prior year assessment amount, will be presented to the community for approval during the annual meeting of the Association as provided in Article V, Section 3. . . .

The paragraph regarding special assessments remained substantially the same, including the language that special assessments need not be uniform.

2. Levying Assessments

Each year HICA's board meets to develop a budget for the upcoming year. It estimates operating expenses and the total estimated income from use-based fees, such as green fees charged for the golf course, moorage fees for the marina, fees paid for water use, fees for annual water hook-up, and ferry ticket sales (Use-Based Fees).  HICA deems Use-Based Fees to be a fair way to allocate the expenses of operating and maintaining these amenities to only those HICA members who use them.  In recent years, Use-Based Fees have covered about 50 percent of HICA's total operating expenses.

After HICA's board determines the amount of money HICA can anticipate from Use-Based Fees, it then evaluates the remaining income it will need to generate from HICA members through annual operating assessments. The board submits the budget to the association members for ratification. The trustees have recommended, and the members have voted to approve, the levying of uniform, per lot annual operating assessments against all lots since at least 1967. If the members do not approve a proposed increase in assessments, the assessments continue to be levied at the rate approved the previous year. Between 2008 and 2015, the members voted to increase the assessments four times. Annual per lot assessments were $339 in 2008 and 2009, and increased to $472 per lot for the years 2013 through 2015.

The largest expense HICA has had in the recent past is a marina renovation and expansion project. HICA members have, over the years, approved two special assessments totaling $4,210 per lot for the improvement project.

3. Hat Island Lots and Surowiecki's Membership

There are 974 lots on Hat Island, and 946 lots are currently owned and assessed. There is some evidence that 249 of these lots are not buildable. Only 268 lots currently have houses, with roughly 40 as full-time residences. While there are water connections for 461 lots, the island's current infrastructure is "not capable of producing sufficient water for the simultaneous, fulltime occupancy of all 461 residences allowed." Because HICA must add new water production sources to raise the state-mandated cap on water hookups, residential

development is stalled at roughly 460 lots. Thus, under current regulations, the remaining 512 lots without water connections cannot be developed.

Surowiecki and more than 100 entities he manages (limited liability companies, limited partnerships, corporations, and a living trust) own over 271 of the 974 lots on Hat Island. In 2012, Surowiecki challenged the marina improvement special assessments. In a settlement agreement arising out of that dispute, the parties identified the lots Surowiecki controls, reached a resolution of the amount of assessments he would pay for these lots, and agreed Surowiecki would have a total of 30 votes for all of the lots he controls.[6] In exchange, Surowiecki waived his claim that the membership votes to approve the marina assessments were invalid or inequitable. But Surowiecki has continued to complain about the marina project costs, alleging that board members have hidden the true costs from HICA members.[7]

The record indicates that, in response to grievances over its assessments, HICA and its board considered requests by lot owners to modify the assessment structure. It specifically considered Surowiecki's request that the assessments be allocated based on each lot's tax-assessed value. The board held several community meetings seeking owner input into the issue of the assessment allocation. As Scott Holte, HICA's former board president, testified:

> There are many differing opinions as to what [HICA's] assessment
> structure should or could be in the future. Some owners promote

---

[6] As far as the record shows, he is the only member who has more than one vote.

[7] In August 2012, Surowiecki's son and Surowiecki's now-wife, sued HICA, challenging the validity of the marina assessment votes and seeking to enjoin the marina projects. That suit was dismissed shortly thereafter on HICA's CR 12(b)(6) motion. HICA obtained an award of $22,266 in attorney fees against Surowiecki's son.

including tax assessment values into the equation. Others promote higher assessments for lots with a home. Still others believe the current structure is appropriate. There are undoubtedly multiple potential assessment and fee structures.

Holte testified that HICA's board decided, in the absence of an amendment to the bylaws, to continue its historic practice of allocating assessments equally among lots.

B. Procedural History

In 2014, Surowiecki filed this lawsuit—individually as a Hat Island lot owner and derivatively on behalf of the homeowner association—against HICA, HICA's manager Motson, and past and current members of the board of trustees.[8] He alleged HICA violated its articles of incorporation, bylaws, and the Covenants by failing to charge assessments "on an equitable basis," violated the covenant of good faith and fair dealing implied in the governing documents, and committed corporate waste. Surowiecki also sought to invalidate the 2012 settlement agreement, alleging he was fraudulently induced to enter into that contract based on misrepresented facts concerning the marina project costs.

As against the individually named defendants, Surowiecki alleged that they had breached fiduciary duties owing to both HICA and its members, and that they had fraudulently or negligently misrepresented the estimated costs of the marina project and HICA's general financial condition. Finally, Surowiecki sought an order compelling an accounting of the association's financial records.

---

[8] Surowiecki stipulated to the dismissal without prejudice of his claims against the trustees, "reserv[ing] all rights of appeal with respect to [his] derivative claims and all other claims that have previously been dismissed on summary judgment in whole or in part by the [c]ourt."

In December 2015, HICA originally moved to dismiss any claim that it did not levy assessments on an "equitable basis," contending that its governing documents "allow, if not require, uniform assessments against all Lots." HICA argued that it had a 48-year history of levying uniform assessments and that "interpreting [HICA's] Governing Documents to require disproportionate assessments against some Lots, based on an Owner's use of their Lot or Island amenities, would re-write [HICA's] Governing Documents to the benefit of some owners and the detriment of others."

Surowiecki opposed the motion, arguing that the owners of undeveloped and undevelopable lots were carrying the financial load for the island, that the assessment structure was inequitable as a result, and that the inequitable assessment structure was the result of the board failing to run the island in a fiscally responsible manner, as required by HICA's articles of incorporation. Surowiecki submitted declarations and deposition testimony from several lot owners to support these arguments.

In January 2016, the trial court denied HICA's motion for summary judgment. The record on this motion indicates only that the court found "that there is a genuine issue of material fact as to whether these assessments are being made in an equitable fashion."

HICA later moved to dismiss any derivative claims Surowiecki asserted on behalf of HICA, arguing he lacked standing to bring the claims. HICA contended that the WNCA does not confer on any individual the right to bring a derivative action on behalf of a nonprofit corporation, that derivative claims cannot be

asserted against the corporate entity, and that the limited statutory exception for challenging ultra vires actions of corporate officers or directors under RCW 24.03.040(2)[9] did not apply to claims against the corporation. The trial court granted the motion in part, dismissing all derivative claims, except any claims alleged under RCW 24.03.040(2).

In May 2017, HICA moved to dismiss any claims that it, Motson, or any board member misrepresented the actual costs of the marina project, including any claim that HICA fraudulently induced Surowiecki to enter into the April 2012 settlement agreement. The court dismissed these claims, concluding Surowiecki had not relied on HICA's representations to his detriment when voting on the marina projects.

In January 2018, HICA again sought to dismiss Surowiecki's claims that the assessments were inequitable. In this renewed motion, HICA argued the business judgment rule applied to its decision on how to allocate assessments. It further argued that, under that rule, for the assessments to be deemed inequitable, Surowiecki had to prove "fraud, dishonesty, or incompetence" on the part of the HICA board.

The court concluded HICA's decision to impose a uniform, per lot assessment was governed by the business judgment rule, citing Riss v. Angel, 131 Wn.2d 612, 934 P.2d 669 (1997). It held that Surowiecki failed to show that HICA's

---

[9] "No act of a corporation . . . shall be invalid by reason of the fact that the corporation was without capacity or power to do such act . . . , but such lack of capacity or power may be asserted . . . [i]n a proceeding by the corporation, whether acting directly or through a receiver, trustee, or other legal representative, or through members in a representative suit, against the officers or directors of the corporation for exceeding their authority."

board breached its duty of care, which required evidence of fraud, dishonesty, or incompetence. The court determined no such evidence had been presented— "Ultimately, there was a vote among members and [Surowiecki's] position did not prevail." The evidence, it concluded, supported the proposition that "the dispute being waged is one of opinion only—not over fraud, dishonesty or incompetence."

In November 2018, Surowiecki voluntarily dismissed all remaining claims under CR 41. The trial court subsequently granted HICA's motion for attorney fees, awarding $13,694 against Surowiecki based on the 2012 settlement agreement. And based on RCW 64.38.050, the trial court awarded $688,423.11 in favor of HICA and $240,923.65 in favor of Motson against Surowiecki and the remaining plaintiffs, Carol Britten and Elena and Alex Borromeo, jointly and severally.

Surowiecki appeals.

ANALYSIS

Surowiecki raises four issues on appeal. First, he contends the trial court erred in concluding that HICA's decision to maintain a uniform, per lot assessment structure is governed by the business judgment rule. He argues the business judgment rule applies to claims against individual corporate officers or directors but not to claims against the corporation itself. He maintains there are genuine issues of material fact regarding whether HICA's assessments are "equitable," and asks us to reverse the trial court's grant of summary judgment to HICA. Second, Surowiecki argues the trial court erred in dismissing his derivative claims for lack of standing. Third, he contends there are genuine issues of material fact regarding

HICA's breach of fiduciary duty when it failed to provide budgets for projects and failed to perform statutorily-required audits. And, finally, Surowiecki challenges the trial court's award of attorney fees. We address each argument in turn.

A. Business Judgment Rule

We review a trial court's order on a motion for summary judgment de novo. Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). A court may grant summary judgment if the evidence, viewed in a light most favorable to the nonmoving party, establishes that there is no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); Wilkinson, 180 Wn.2d at 249.

The business judgment rule limits the liability of corporate management where (1) the decision to undertake a transaction is within the power of the corporation and the authority of its management; and (2) there is a reasonable basis to indicate the transaction was made in good faith. Scott v. Trans-System, Inc., 148 Wn.2d 701, 709, 64 P.3d 1 (2003). If the rule applies, a plaintiff may only challenge a decision if made through fraud, dishonesty, or incompetence. Id. The rule is based on the notion that "neither the directors nor the other officers of a corporation are liable for mere mistake[s] or errors of judgment, either of law or fact." Nursing Home Bldg. Corp. v. DeHart, 13 Wn. App. 489, 498-99, 535 P.2d 137 (1975) (internal quotation marks omitted) (quoting W. FLETCHER, PRIVATE CORPORATIONS §§ 1039, at 621-25 (perm. ed. 1974)).

Surowiecki argues the business judgment rule applies only to officers and directors serving a corporation and does not apply to claims against the corporation itself. Washington law supports this argument.

Generally, the business judgment rule applies to any decisions made by corporate management, including officers and directors of the entity. Para-Medical Leasing, Inc. v. Hangen, 48 Wn. App. 389, 395, 739 P.2d 717 (1987); see also Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 508-09, 728 P.2d 597 (1986). Washington courts have applied the business judgment rule in the context of claims against individual officers or directors, not in the context of claims against the corporation itself. See, e.g., Scott, 148 Wn.2d at 705, 708-09 (minority shareholder sought dissolution of corporation based on allegations that majority shareholders wasted corporate assets); McCormick v. Dunn & Black, P.S., 140 Wn. App. 873, 877-78, 887, 167 P.3d 610 (2007) (law firm minority shareholder suit against two majority shareholders seeking to dissolve the corporation based on the majority shareholders' allegedly "illegal, oppressive or fraudulent conduct"); Shinn v. Thrust IV, Inc., 56 Wn. App. 827, 829, 832-37, 786 P.2d 285 (1990) (business judgment rule did not apply to protect general partner from liability where limited partners sued general partner for breach of fiduciary duty to partnership); Para-Medical Leasing, Inc., 48 Wn. App. at 390 (corporation sued certified public accountant for mismanagement of its business); Interlake Porsche & Audi, Inc., 45 Wn. App. at 506, 509 (minority shareholder sued majority shareholder for spending corporate funds for personal use); Schwarzmann v. Ass'n of Apartment Owners of Bridgehaven, 33 Wn. App. 397, 401, 655 P.2d 1777 (1982) (condo owners

precluded from suing board directors and members individually under business judgment rule); Nursing Home Bldg. Corp., 13 Wn. App. at 490-91, 498-500 (receiver for corporation sued former shareholders for fraudulent misappropriation of corporate assets).

The rule clearly applies to managerial decisions made by individual officers or directors of a corporation. It is less clear, however, if the rule applies to a homeowner association's decision—ratified by a vote of its members—that its governing documents require a particular assessment structure or that the adopted assessment structure complies with the discretion afforded in its governing documents.

HICA relies on Riss for the proposition that the business judgment rule precludes a member within a homeowner association from suing the association for decisions made by that association. But this is an overstatement of Riss's holding. In that case, the covenants gave the association's board of directors the power to approve or disapprove any lot owner's proposed construction plans and allowed an owner aggrieved by a board decision to appeal to the members, who then had the power to affirm or reverse the board's decision by a majority vote. 131 Wn.2d at 616-17. Riss, a lot owner, sued every single member of the homeowner association—not the association itself—claiming that the covenant at issue was unenforceable and, alternatively, that the members' rejection of his building plans was unreasonable and arbitrary. Id. at 615, 619.

After a trial, the trial court affirmed the covenant's validity but found the members had unreasonably rejected Riss's plans by failing to compare them to

other homes permitted in the same neighborhood, by failing to conduct an adequate investigation into the plans' compliance with the covenants, and by relying on inaccurate information. Id. at 620.

Our Supreme Court affirmed the trial court's findings, holding that the members' discretionary rejection of Riss's plans was subject to a reasonableness test. Id. The court concluded the record supported the trial court's findings that the homeowners had acted unreasonably in voting to disapprove Riss's plans. Id. at 628. The court rejected the individual members' argument that they could not be held personally liable for their vote to disapprove the plans because they acted in good faith and consistent with the business judgment rule. Id. at 631. It concluded that "good faith is not the sole criteria for [the] exercise of discretion under a consent to construction covenant." Id.

In discussing the applicability of the business judgment rule, the court stated, "The role of the business judgment rule where homeowners associations is concerned is the subject of ongoing debate." Id. It concluded, "[W]hether or not the business judgment rule should be applied to property owners associations, the decisions of these associations must be reasonable." Id. at 632, 681. It went on to state that even under the business judgment rule, "[r]easonable care is required." Id. "[T]he rule if applied here would not exonerate the homeowners for their unreasonable decision to reject [Riss's] proposal. At the least, their failure to adequately investigate would remove them from the rule's insulating effect." Id. at 633.

Riss did not definitively apply the business judgment rule to decisions made by homeowner associations. And the facts of the case show the court was addressing the issue of liability of individual members, not the liability of the corporate entity itself.

Furthermore, we cannot find a published decision applying the business judgment rule to the corporate entity. Although Division Two stated, in passing, in Shorewood West Condominium Ass'n v. Sadri, 92 Wn. App. 752, 966 P.2d 372 (1998), reversed on other grounds, 140 Wn.2d 47, 992 P.2d 1008 (2000), that the business judgment rule applied to actions of a homeowner association, that statement is dicta and, thus, of limited precedential value. Id. at 753-54, 757 (concluding that condominium association's bylaw amendment, prohibiting leasing of condos, could be enforced against owners who purchased before amendment passed).

Additionally, several cases support the conclusion that the business judgment rule does not apply to homeowner associations' interpretations of their governing documents and that courts have authority to interpret an association's governing documents.

First, Riss clearly held that when the governing documents give a homeowner association the discretion to take a particular action, the exercise of that discretion must be reasonable. 131 Wn.2d at 628, 630. It acknowledged that a court may not substitute its judgment for that of the association, but it may consider the manner in which the decision was made and the information the association members had before them to determine if the decision was

reasonable. Id. at 630. In cases since Riss, this court has held that the reasonableness of an association's actions is a question of fact. See, e.g., Green v. Normandy Park, 137 Wn. App. 665, 693-95, 151 P.3d 1038 (2007) ("Questions regarding the 'reasonableness' of the decision made . . . focus on the process employed and the facts considered.").

Moreover, in Roats v. Blakely Island Maintenance Commission, Inc., 169 Wn. App. 263, 266, 279 P.3d 943 (2012), property owners sued a homeowner association, challenging that association's authority under its governing documents to create a limited liability company for the purpose of leasing the operation of a marina, fuel dispensers, and a general store. We held that the governing documents of a corporation are interpreted in accordance with accepted rules of contract interpretation and that the appellate court's review is de novo. Id. at 273-74. Based on these standards from Roats, courts are not required by the business judgment rule to defer to a homeowner association's interpretation of its articles of incorporation, bylaws, and covenants.

Lastly, in Ackerman v. Sudden Valley Community Ass'n, 89 Wn. App. 156, 158-59, 163-64, 944 P.2d 1045 (1997), this court interpreted an association's governing documents to evaluate the validity of a dues structure adopted by the association's members. There, one member, Katherine Yurica, challenged the board's decision to amend the dues structure to charge higher annual dues to owners of improved lots than charged to owners of unimproved lots. Id. at 160. Yurica argued the two-tiered dues structure violated the covenants and the association's articles of incorporation. Id. 159-60. The covenant language at issue

there was identical to that set out in HICA's Covenants: "[Sudden Valley Community Association (SVCA)] shall have the power to charge and assess its members on an equitable basis for the operation and maintenance of said facilities . . . and to charge and assess its members on an equitable basis for such additional recreational or other facilities. . . ." Id. at 163-64.

The trial court concluded that the covenants, which required that dues assessments be "equitable," did not prohibit a tiered dues structure but the articles of incorporation did. Id. at 160. An intervening lot owner appealed the court's interpretation of the articles of incorporation; Yurica cross appealed the court's interpretation of the covenants. Id. at 161.

This court held that the association's covenants vested discretion in SVCA to assess its members but that this discretion "is limited only by the requirement that such assessments be on an equitable basis." Id. at 164. It defined "equitable" as "characterized by equity: fair to all concerned." Id. (internal quotation marks omitted) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 769 (1969)). This court rejected the argument that the covenant language mandated equal and uniform assessments to all lot owners.

> There is nothing in this governing scheme which necessarily leads one to conclude that the original intent of the covenant language was to impose a rigid formula of, for example, equal assessments for all lots. Equality is not the sole, or even a necessary cornerstone of equity under all circumstances.

Id. at 164. And it went on to conclude, "The founders of Sudden Valley intentionally vested SVCA with discretion to annually establish assessments on an equitable basis, depending upon circumstances then prevailing. Such a declaration is clear

and unambiguous, and will be given its manifest meaning." Id. at 165. This court affirmed the trial court's interpretation of the covenants as permitting a tiered dues structure. It reversed the trial court's interpretation of the articles of incorporation, concluding that they too permitted a multi-tiered dues system, "if equitable." Id. at 168.

These cases clearly stand for the proposition that the interpretation of a homeowner association's governing documents is a question of law and not a decision to which judicial deference is owed under the business judgment rule. This conclusion is further supported by HICA's governing documents themselves. Paragraph 17 of the Covenants provides that enforcement of the Covenants "shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenant, either to restrain violation or to recover damages, or both." When an association's bylaws or covenants provide that individuals may invoke the jurisdiction of the court to resolve covenant disputes, the court may substitute its judgment for that of the homeowner association board. Wimberly v. Caravello, 136 Wn. App. 327, 335-36, 149 P.3d 402 (2006).

Our review of Washington precedent shows that the business judgment rule limits only personal liability of individuals. As a result, we conclude the business judgment rule does not immunize corporations. Furthermore, courts need not defer to a homeowner association's interpretation of its own governing documents. The interpretation of articles of incorporation, bylaws, and covenants presents a question of law, and the business judgment rule plays no role in this interpretive process. The trial court erred in so concluding.

B. Reasonableness of HICA's Decision to Impose Uniform, Per Lot Assessment Structure

Although Surowiecki correctly contends the business judgment rule does not preclude us from interpreting HICA's governing documents, Surowiecki incorrectly maintains that a trier of fact should decide whether any particular assessment structure is "equitable." Under Ackerman, the homeowner association and its members have the discretion to decide what type of assessment structure is "equitable." Riss clearly holds that this type of discretionary decision is subject to review only for its reasonableness. And whether a homeowner association's decision to adopt any particular assessment structure is reasonable depends not on the substance of the decision but rather on the "the process employed and the facts considered." Green, 137 Wn. App. at 695.

HICA argued below that its bylaws mandate the uniform, per lot assessment structure. We disagree with this interpretation of its bylaws.

Interpreting covenants is a question of law, and we employ rules of contract interpretation to determine the drafter's intent, which is a question of fact. Wilkinson, 180 Wn.2d at 249-50. "'[I]nterpretation of a particular covenant is largely dependent upon the facts of the case at hand.'" Id. at 253 (quoting Mains Farm Homeowners Ass'n v. Worthington, 121 Wn.2d 810, 827, 854 P.2d 1072 (1993)). Where the dispute is between homeowners who are jointly governed by the covenants, "'[t]he court's goal is to ascertain and give effect to those purposes intended by the covenants.'" Id. at 250 (alteration in original) (quoting Riss, 131 Wn.2d at 623). "[W]e give covenant language 'its ordinary and common use' and will not construe a term in such a way 'so as to defeat its plain and obvious

meaning.'" Id. (quoting Mains Farm, 121 Wn.2d at 826; Riss, 131 Wn.2d at 623). Special emphasis is placed on "arriving at an interpretation that protects the homeowners' collective interests." Id. (internal quotation marks omitted) (quoting Riss, 131 Wn.2d at 623-24). "[W]here reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." Id. (internal quotation marks omitted) (quoting Ross v. Bennett, 148 Wn. App. 40, 49, 203 P.3d 383 (2009)).

The plain language of HICA's assessment provision requires annual operating assessments to be "equitable." It says nothing about them needing to be uniform. HICA's interpretation of its bylaws is based on the language of the "special assessments" provision of its bylaws which provides:

> Special assessments may be levied only upon the affirmative vote of a simple majority of members in good standing voting in person or by proxy at a meeting of members of the Association. Special assessments do not need to be uniform, and may apply only to those lots specially benefitted[.]

HICA contends if special assessments "do not need to be uniform," then that implies the annual operating assessments must be uniform. Holte, HICA's former board president, testified that the HICA board interprets this bylaw as precluding non-uniform assessments. Although he recognized that people's opinions differed on the most appropriate assessment structure, "[u]nless and until [HICA's] Bylaws are amended, the Board intends to continue allocati[ng] expenses between Annual Operating Assessments, Special Assessments and Use-Based Fees as set forth in its governing documents."

But HICA's argument ignores the context of the "special assessments" language. The 2002 version of HICA's bylaws stated:

> <u>The Board of Trustees shall annually establish an assessment against each and every lot on a uniform basis</u>. The amount of such assessments levied shall in no event, except as hereinafter provided, exceed in any one month the sum of [t]wenty one dollars and twenty five cents ($21.25) per lot. Assessments will be established and levied upon all properties following the affirmative vote of a simple majority (50% plus 1) of all members in good standing. . . .
>
> . . . .
>
> Special assessments . . . do not need to be uniform, and may apply only to those lots specially benefitted[.] . . .

(Emphasis added). When these two paragraphs are read in context, it is clear the "special assessments do not need to be uniform" language was intended to clarify that the uniformity requirement only applied to the annual assessments.

But in 2010, the members amended the bylaws to remove the uniformity requirement for annual assessments. The special assessments provision was not changed. Thus, the "special assessments do not need to be uniform" language cannot logically imply that annual assessments must be uniform when the members explicitly chose to delete that requirement in 2010.

We conclude there is nothing in HICA's bylaws requiring it to impose uniform, per lot annual operating assessments. HICA's governing documents require only that the membership determine that the adopted assessment structure is equitable. As we held in <u>Ackerman</u>, "equitable" does not mean "equal" or "uniform." 89 Wn. App. at 164.

From this record, it is impossible to determine if HICA's board and its members ever made a formal decision to retain the existing assessment structure

or to reject Surowiecki's proposed alternative. And we cannot determine if the members have voted to maintain this system because they have considered the options and deem it to be equitable or because they were advised that uniformity was mandated by HICA's bylaws.

If HICA's board and its members erroneously believed its bylaws mandate uniform assessments, a trier of fact could conceivably find that the decision to retain this structure was not well-founded legally and thus unreasonable. If, however, HICA retained this uniform structure because, after a thorough vetting at community meetings, the membership concluded the current structure is as equitable as any other, then a trier of fact could conclude that "the process employed and the facts considered" were reasonable. We therefore reverse summary judgment of Surowiecki's assessment claim.[10]

### C. Standing for Derivative Claims

Next, Surowiecki argues the trial court erred by dismissing his derivative claims for lack of standing. We disagree. In Mohandessi v. Urban Venture LLC, 12 Wn. App. 2d 625, 459 P.3d 407 (2020), as amended on reconsideration, 2020 WL 3496564, at *7-8 (June 29, 2020), we concluded that individual condominium association members do not have derivative standing. In that case, the condominium association of a mixed use building was incorporated under the WNCA. Id. at *1, *7. Individual members of the association brought derivative claims on behalf of the association. Id. at *3. This court held that the WNCA does

---

[10] Because the trial court applied the incorrect standard to HICA's motion for summary judgment, we do not address the admissibility of any of the evidence Surowiecki presented. Admissibility of this evidence needs to be re-evaluated in light of the proper legal test.

not authorize members to bring derivative actions on behalf of the nonprofit corporation against third parties. Id. at *8; see also Lundberg v. Coleman, 115 Wn. App. 172, 176-78, 60 P.3d 595 (2002) (similarly concluding no common law right for derivative actions on behalf of nonprofit corporations exists), review denied, 150 Wn.2d 1010, 79 P.3d 446 (2003). Mohandessi and Lundberg are dispositive of this claim.

D. Breach of Fiduciary Duty

Next, Surowiecki argues the trial court erred in dismissing his breach of fiduciary duty claim against HICA. He contends he presented evidence that HICA breached this duty by failing to govern the association "in a fiscally responsible manner." But Surowiecki did not assert a breach of fiduciary duty claim against HICA.

In Surowiecki's Third Amended Complaint, his first cause of action sought a declaratory judgment that HICA's governing documents require it to operate Hat Island in a "fiscally responsible manner." And he alleged HICA failed to comply with this provision of the governing documents. He did not allege that this noncompliance violated a fiduciary duty owed to him.

In his second cause of action,[11] Surowiecki alleged the individual board members—not HICA—breached fiduciary duties owed to HICA in their

---

[11] Surowiecki's fiduciary duty claim specifically stated:

> By the virtue of defendant Motson's position as Manager, and other Individual Defendants' positions on the Board of Trustees . . . , the Defendants owe or owed statutory and common law duties to all lot owners, including the duty to act as a fiduciary in regard to the Association's affairs and to manage the Association in a fair, just, and equitable manner; to act in furtherance of the best interests of Association and its members; and to refrain from abusing any position of control.

- 24 -

management of the association.[12]  But he did not allege HICA, the corporate entity, did so.

The closest Surowiecki came to asserting a fiduciary duty claim against HICA was his sixth cause of action for corporate waste.  He alleged that HICA had misused and wasted corporate assets through mismanaging the marina improvement projects, purchasing a ferry that needs constant significant repairs, failing to settle a claim with the Puget Sound Yacht Club (PSYC), and conducting an illegal recall election in 2014.

The final judgment describes the disposition of the sixth cause of action:

6. Sixth Claim: Corporate Waste
   - Plaintiffs' claims for Corporate Waste related to HICA's charging of assessments were dismissed on partial summary judgment by order dated June 14, 2018.
   - Plaintiffs' claims for Corporate Waste related to the [PSYC] Settlement were dismissed on partial summary judgment by order dated June 27, 2017.
   - Plaintiffs' claims for Corporate Waste related to the 2014 Recall Election were dismissed on partial summary judgment by order dated June 27, 2017.

Surowiecki did not appeal the June 27, 2017 orders relating to the PSYC settlement or the 2014 recall election.  Although there is no mention in the final

_____

By virtue of the acts and conduct alleged herein, Defendants have breached their fiduciary duties of care, loyalty, and accountability to the Association and its members.

The trial court dismissed this claim in its June 14, 2018 order granting Motson's partial motion for summary judgment.  As previously discussed, Surowiecki abandoned his appeal relating to this order.  See supra note 1.

[12] Even assuming Surowiecki meant to challenge the individual defendants' alleged breach of fiduciary duty, he failed to clearly address this claim in his opening brief.  He inconsistently referenced HICA's board and HICA as an entity, but his arguments focused solely on HICA.  Furthermore, he failed to preserve this claim because in the September 29, 2017 order voluntarily dismissing the individual defendants, he reserved only his rights to appeal derivative claims and claims previously dismissed on summary judgment.  The trial court did not dismiss the breach of fiduciary duty claim on summary judgment until almost nine months later.

judgment regarding Surowiecki's claim that HICA committed corporate waste by mismanaging the marina projects, the trial court dismissed Surowiecki's claim that he was fraudulently induced into settling his claim regarding the marina project special assessments, concluding he presented no proof of any fraud. Surowiecki did not appeal this order either. And the final judgment provides that Surowiecki voluntarily dismissed all claims not previously dismissed. We conclude that Surowiecki did not allege below that HICA breached any fiduciary duties owing to its members and that he has not preserved for appeal any claim of corporate waste.

E. Attorney Fee Award

Finally, Surowiecki challenges the attorney fees awarded to HICA and Motson. Because we reverse and remand the trial court's summary judgment ruling on Surowiecki's assessment claim against HICA, we necessarily vacate the association's attorney fees award—with the exception of the award based on the 2012 settlement agreement and Surowiecki's failed fraudulent inducement claim. We affirm the fee award in favor of Motson.

"Washington follows the American rule 'that attorney fees are not recoverable by the prevailing party as costs of litigation unless the recovery of such fees is permitted by contract, statute, or some recognized ground in equity.'" Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wn.2d 130, 143, 26 P.3d 910 (2001) (quoting McGreevy v. Or. Mut. Ins. Co., 128 Wn.2d 26, 35 n.8, 904 P.2d 731 (1995)). We apply a two-part review of attorney fee awards—(1) a de novo review of whether there is a legal basis in contract, statute,

or equity, and (2) an abuse of discretion review as to the reasonableness of the attorney fee award. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

The trial court based its award to HICA of $13,694 against Surowiecki on the 2012 settlement agreement between Surowiecki and HICA. "A prevailing party may recover attorney fees pursuant to a contractual fee-shifting provision if the action involves claims 'on the contract.'" Boyd v. Sunflower Props., LLC, 197 Wn. App. 137, 150, 389 P.3d 626 (2016) (quoting Hemenway v. Miller, 116 Wn.2d 725, 742-43, 807 P.2d 863 (1991)). An action is on a contract if it arose out of the contract and the contract is central to the dispute. Burns v. McClinton, 135 Wn. App. 285, 309-10, 143 P.3d 630 (2006).

Surowiecki's eighth claim for fraud in the inducement alleged that the 2012 settlement was void because HICA, Motson, and other defendants "intentionally misrepresented or omitted material facts concerning the marina projects, including its anticipated costs, to induce" Surowiecki to enter into a settlement agreement in April 2012. He sought a judicial determination that the agreement was void based on this alleged fraudulent inducement.

HICA succeeded in having this claim dismissed on summary judgment, arguing statements regarding anticipated costs of the marina project were not actionable statements of fact and Surowiecki did not reasonably rely on these statements. The court concluded:

> Surowiecki is on record as being openly in opposition to the marina improvement project. This is [an] undisputed material fact. The court's view is that in order to viably maintain any sort of fraud or misrepresentation cause of action[,] [Surowiecki] would have had to

rely on HICA's representations and voted or acted in support to his detriment. This never happened.

It concluded that any expressions of opinion regarding future costs or benefits of the marina were not actionable and that Surowiecki failed to present evidence that he ever actually relied on any of HICA's marina cost estimates. The court dismissed Surowiecki's fraudulent inducement claim on these grounds, and Surowiecki has not appealed the order dismissing this claim.

Paragraph 12 of the 2012 settlement stated:

The non-prevailing party in any judicial proceeding to enforce any of the provisions or rights under or pursuant to this Agreement, including without limitation any claim for declaratory relief or rescission, shall be fully responsible for and pay the prevailing Party's reasonable attorneys' fees, costs, and expenses, including, without limitation, those incurred preliminary to the institution of any such action or proceeding and with respect to any appeal arising therefrom, which attorneys' fees, costs, and expenses awarded hereunder shall be included as a part of any ruling, award, or judgment.

We conclude the trial court did not err in awarding HICA attorney fees incurred in enforcing its rights under the 2012 settlement agreement. First, the fraudulent inducement claim "arose out of the contract." Surowiecki sought to nullify the promises he made to HICA in that agreement.

Second, the contract was central to the dispute. HICA had to bring its summary judgment motion to enforce its rights under the agreement. Surowiecki argues that because the 2012 settlement agreement related to special assessments for the marina project, the agreement is inapplicable to determining the validity of the annual operating assessments. This argument, of course,

ignores Surowiecki's eighth claim, in which he sought a determination that the 2012 agreement was void.

Surowiecki also argues that the lawsuit was not one "to enforce any provisions or rights under or pursuant to [the 2012] [a]greement." We disagree. The clause refers to "judicial proceeding," not to a particular lawsuit. Surowiecki brought a lawsuit seeking to invalidate the entire agreement; HICA initiated a judicial proceeding to enforce its rights under the agreement by moving for summary judgment on the fraudulent inducement claim. Thus, we affirm the trial court's attorney fee award of $13,694 in favor of HICA because Surowiecki did not appeal the order dismissing his eighth cause of action to invalidate the 2012 settlement agreement.

We also affirm the trial court's award of $240,923.65 in favor of Motson against Surowiecki, Britten, and the Borromeos, jointly and severally. The trial court based its fee award to Motson under RCW 64.38.050, which gives the trial court the discretion to award reasonable attorney fees to the prevailing party. Surowiecki did not explain how awarding fees to Motson constituted an abuse of discretion. Even if Surowiecki had not abandoned his appeal as to Motson, he specifically argued below that Motson owed him a fiduciary duty under chapter 64.38 RCW. He cannot now argue that there is no legal basis for an attorney fee award pursuant to RCW 64.38.050 when he specifically invoked that chapter against Motson as the basis for his claim against him. We therefore affirm the fee award to Motson.

## CONCLUSION

We affirm the trial court's dismissal of Surowiecki's claims with the exception of his claim that HICA has unreasonably determined that a uniform, per lot assessment is equitable. We vacate the attorney fee award, except as to the $13,694.00 the trial court awarded to HICA solely against Surowiecki pursuant to the 2012 settlement agreement and as to the $240,923.65 awarded to Motson against Surowiecki, Britten, and the Borromeos, jointly and severally.

Because HICA is not the prevailing party on appeal, we deny its request for attorney fees. Surowiecki's request for costs is granted subject to his submission of a cost bill pursuant to RAP 14.4. Motson's request for costs is denied.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Chun, J._                    _Appelwick, J._